United States Court of Appeals,

Eleventh Circuit.

No. 97-5144.

Irmgard LIPCON;  Mitchell Lipcon;  Charles R. Lipcon;  Barbara Lipcon, Plaintiffs-Appellants,

v.

UNDERWRITERS AT LLOYD'S, LONDON, a.k.a. Corporation of Lloyd's, a.k.a. Society of Lloyd's, a.k.a. Lloyd's of London, Defendants-Appellees.

Aug. 5, 1998.

Appeal from the United States District Court for the Southern District of Florida. (NO. 96-1137-CV-FAM), Federico A. Moreno, Judge.

Before HATCHETT, Chief Judge, BLACK, Circuit Judge, and KRAVITCH, Senior Circuit Judge.

KRAVITCH, Senior Circuit Judge:

In this appeal, we are confronted with the important question of whether the anti-waiver provisions of the United States securities laws preclude enforcement of certain choice-of-law and forum-selection clauses ("choice clauses") in international agreements. Although we recognize that it is a close question, we follow the weight of circuit authority and conclude that the choice clauses are enforceable despite the anti-waiver provisions. In addition, we conclude that the agreements in this case satisfy scrutiny for fundamental fairness and do not contravene public policy. Finally, we conclude that Irmgard, Mitchell, Charles, and Barbara Lipcon (collectively, "appellants" or "the Lipcons") all are bound by their agreement with Underwriters at Lloyd's London ("Lloyd's"). Accordingly, we affirm the district court's decision to dismiss the Lipcons' complaint against Lloyd's.

I.

Lloyd's is a large insurance market in which more than three hundred Underwriting Agencies compete for underwriting business. Pursuant to the British Lloyd's Acts of 1871 and 1982, Lloyd's oversees and regulates the competition for underwriting business in the insurance market; according to the *amicus curiae* brief of the British Government, Lloyd's "has statutory powers granted by Parliament to regulate the affairs of the international insurance market in London...."[1] Lloyd's itself, however, does not accept premiums or insure risks. Instead, Underwriting Agencies, which act as syndicates, compete for the insurance business. Each Underwriting Agency is controlled by a Managing Agent, who is responsible for the financial status of its agency. The Managing Agent must attract not only underwriting business from brokers but also the capital with which to insure the risks that are underwritten.

Managing Agents recruit "Names" to provide the underwriting capital. A Name becomes a Member of the Society of Lloyd's through a series of agreements, proof of financial means, and the deposit of an irrevocable letter of credit in favor of Lloyd's. By becoming a Member, a Name obtains the right to participate in the Lloyd's Underwriting Agencies. The Names, however, do not deal directly with Lloyd's or with the Managing Agents. Instead, the Names are represented by Members' Agents, who, pursuant to agreement, act as fiduciaries for the Names. Upon becoming a Name, an individual selects the underwriting agencies in which he wishes to participate. The Names generally join more than one underwriting agency in order to spread their risks across different types of insurance. In large part because of the experience of the Members' Agents, Names generally rely on the advice of their Members' Agents in deciding in which syndicates to invest.

---

[1]British Government Br. *Amicus Curiae* at 3.

2

Selecting well is of the utmost financial importance because a Name is responsible for his share of an agency's losses.

In addition to providing the indicia of financial security mentioned above, to become a Name one must travel to England to acknowledge the attendant risks of participating in a syndicate by signing a standard-form "General Undertaking." The General Undertaking is a two-page document containing choice-of-forum and choice-of-law clauses (collectively the "choice clauses"), which form the basis for this dispute. The choice clauses provide:

> The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England.

> Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding ... arising out of or relating to such matters shall be brought in such courts....[2]

Irmgard and Mitchell Lipcon are Names who entered into underwriting agreements, and Charles and Barbara Lipcon, who signed letters of credit to provide collateral for the Names, are their spouses. Irmgard and Mitchell first became Names in 1983 and 1984, respectively, and in 1986 signed a revised General Undertaking that contains the choice clauses set out above.

After it became clear that the Names would be responsible for massive losses for asbestos and pollution claims, appellants brought suit in United States District Court for the Southern District of Florida alleging that: (1) Lloyd's actively sought investors from the United States to fill an urgent need to build up capital; (2) concealed information regarding the possible consequences of the risks

---

[2]R:1-8, Ex. B.

3

undertaken; and (3) deliberately and disproportionately exposed the Names to massive liabilities for which sufficient underwriting capital or reinsurance was not available. The Lipcons stated claims under the Securities Act of 1933, §§ 5, 12(1), & 15, 15 U.S.C. §§ 77e, 77*l,* & 77o, the Securities Exchange Act of 1934, §§ 10(b) & 20, 15 U.S.C. §§ 78j & 78t, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and various provisions of Florida law. The district court granted the motion to dismiss brought by Lloyd's, finding that the choice clauses are enforceable and preclude litigation arising out of the Lipcons' agreement with Lloyd's in United States courts. In addition, the district court concluded that Charles and Barbara Lipcon, who signed letters of credit in favor of Lloyd's but never entered into any agreement with Lloyd's, are bound by the choice clauses.

As in numerous similar cases in the courts of appeals involving these choice clauses, "[t]his appeal does not address the merits of the underlying claims. It addresses only the Names' contention that their disputes with Lloyd's should be litigated in the United States despite contract clauses binding the parties to proceed in England under English law." *Richards v. Lloyd's of London,* 135 F.3d 1289, 1292 (9th Cir.1998).

## II.

As a preliminary matter, we note that some uncertainty exists as to both the appropriate vehicle for motions to dismiss on the basis of forum-selection clauses and the proper standard of review for district court decisions granting such motions to dismiss. *See Haynsworth v. Lloyd's of London,* 121 F.3d 956, 961 & n. 8 (5th Cir.1997) (citing cases); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1352 (2d ed. Supp. 1998). In the case before us, Lloyd's styled its motion as a Rule 12(b)(3) motion to dismiss for improper venue.

4

The Ninth Circuit has treated such motions as motions brought pursuant to Fed.R.Civ.P. 12(b)(3) to dismiss for lack of venue, *see Richards v. Lloyd's of London,* 135 F.3d 1289, 1292 (9th Cir.1998); *cf. Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 207 (7th Cir.1993) (affirming district court's grant of defendant's Rule 12(b)(3) motion to dismiss for improper venue in case involving forum-selection clause); *Commerce Consultants Int'l v. Vetrerie Riunite,* 867 F.2d 697, 698 (D.C.Cir.1989) (same), and has reviewed district court decisions to enforce forum-selection and choice-of-law clauses for abuse of discretion, *see id.; accord Sun World Lines, Ltd. v. March Shipping Corp.,* 801 F.2d 1066, 1068 & n. 3 (8th Cir.1986). The Second Circuit, on the other hand, has treated such motions as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See AVC Nederland B.V. v. Atrium Inv. Partnership,* 740 F.2d 148, 153 & n. 8 (2d Cir.1984). Finally, several circuits have avoided resolving the issue of the appropriate form of pleading for a motion to dismiss based upon choice clauses and instead have held simply that "the enforceability of a forum selection clause is a question of law reviewable *de novo.*" *Haynsworth,* 121 F.3d at 961; *see id.* (electing not to reach "the considerably more enigmatic question of whether motions to dismiss on the basis of forum selection clauses are properly brought as motions under Fed.R.Civ.P. 12(b)(1), 12(b)(3), or 12(b)(6), or 28 U.S.C. § 1406(a)"); *Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227, 1229 (6th Cir.1995); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956 (10th Cir.1992) (noting that "[a] motion to dismiss based on a forum selection clause frequently is analyzed as a motion to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3)," but failing to resolve issue).

In our view, motions to dismiss based upon forum-selection clauses ordinarily are not properly brought pursuant to Rule 12(b)(1), which permits motions to dismiss for lack of subject

5

matter jurisdiction, because the basis upon which the defendants seek dismissal—namely, that the agreement of the parties prohibits the plaintiff from bringing suit in the particular forum—is unrelated to the actual basis of federal subject matter jurisdiction—namely, federal question jurisdiction or diversity of citizenship, as the case may be. In the case before us, appellants stated claims under, *inter alia,* the federal securities laws, a sufficient basis for federal subject matter jurisdiction that is not affected by the parties' agreement to litigate elsewhere. *See, e.g., Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Blue Cross & Blue Shield of Ala. v. Sanders,* 138 F.3d 1347, 1352 (11th Cir.1998) (noting that under *Bell,* "a federal court may dismiss a federal question claim for lack of subject matter jurisdiction only if: (1) "the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction'; or (2) "such a claim is wholly insubstantial and frivolous' ") (quoting *Bell,* 327 U.S. at 682-83, 66 S.Ct. at 776) (emphasis omitted); *Central Contracting Co. v. Maryland Cas. Co.,* 367 F.2d 341, 345 (3d Cir.1966) (stating that a forum-selection clause "does not oust the jurisdiction of the courts; in effect it merely constitutes a stipulation in which the parties join in asking the court to give effect to their agreement by declining to exercise its jurisdiction"). Instead, we hold that motions to dismiss upon the basis of choice-of-forum and choice-of-law clauses are properly brought pursuant to Federal Rule of Civil Procedure 12(b)(3) as motions to dismiss for improper venue.

We are aware that the First Circuit has treated motions to dismiss upon the basis of forum selection clauses as Rule 12(b)(6) motions urging dismissal for failure to state a claim upon which relief can be granted. *See Lambert v. Kysar,* 983 F.2d 1110, 1112 n. 1 (1st Cir.1993); *LFC Lessors, Inc. v. Pacific Sewer Maintenance,* 739 F.2d 4, 6-7 (1st Cir.1984). Although we perceive no

significant doctrinal error in that approach, we consider Rule 12(b)(3) a more appropriate vehicle through which to assert the motion to dismiss. We find support for this conclusion in the Supreme Court's decision in *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 32, 108 S.Ct. 2239, 2245, 101 L.Ed.2d 22 (1988), in which the Court held that 28 U.S.C. § 1404(a), which vests in the district court discretion to transfer a civil action to "any other district or division where it might have been brought," controls the request of a party in a diversity suit to give effect to a contractual forum-selection clause by transferring the action. Although the Supreme Court did not decide the precise question presented in the case before us, the Court's conclusion that the federal transfer-of-*venue* statute governs district court decisions in enforcing forum-selection clauses provides support for our view that motions to dismiss based upon forum-selection clauses are cognizable as motions to dismiss for improper venue. *See id.* at 29-30, 108 S.Ct. at 2244 ("The flexible and individualized analysis Congress prescribed in § 1404(a) thus encompasses consideration of the parties' private expression of their *venue* preferences.") (emphasis added); *see also* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3803.1 (2d ed. 1986 & Supp. 1998) (discussing forum-selection clauses as "Contractual Modification" of venue).[3]

---

[3]Unlike in *Stewart,* however, the federal statutory provisions governing transfer of venue from one United States District Court to another, *see* 28 U.S.C. § 1404(a) (providing that district court "may transfer any civil action to *any other district or division* where it might have been brought") (emphasis added); 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to *any district or division* in which it could have been brought.") (emphasis added), do not apply in cases that involve a forum-selection clause that requires litigation in another *country.*

7

Although ordinarily we review "the dismissal of a lawsuit for improper venue under the standard of abuse of discretion," *Home Ins. Co. v. Thomas Indus., Inc.,* 896 F.2d 1352, 1355 (11th Cir.1990), we conclude that there is good reason to treat district court decisions regarding the enforceability of forum-selection and choice-of-law provisions in international agreements as decisions of law reviewable *de novo.* Not only do such decisions at times require interpretation of the provisions of a contract—determinations that we review *de novo, see, e.g., Zaklama v. Mt. Sinai Med. Center,* 906 F.2d 650, 652 (11th Cir.1990)—but such decisions also, at least in the context of international agreements, require a complex analysis of fundamental fairness and public policy, *see infra,* section III—determinations that are quintessentially legal. We therefore hold that the enforceability of forum-selection and choice-of-law provisions in international agreements are questions of law that we review *de novo.*

A.

We note at the outset that although this circuit has not yet ruled on the validity of the Lloyd's choice clauses at issue in this case, we do not write on a clean slate. Thus far, the Second,[4] Fourth,[5]

---

[4]*See Roby v. Corporation of Lloyd's,* 996 F.2d 1353 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993).

[5]*See Allen v. Lloyd's of London,* 94 F.3d 923 (4th Cir.1996).

8

Fifth,[6] Sixth,[7] Seventh,[8] Ninth,[9] and Tenth[10] Circuits have addressed the enforceability of the precise choice clauses that we confront today, and although the reasoning of those courts has not been uniform, all seven courts of appeals have concluded that the clauses are valid and enforceable. *See generally* D. Hall, Note, *No Way Out: An Argument Against Permitting Parties to Opt Out of U.S. Securities Laws in International Transactions,* 97 Colum. L.Rev. 57, 68 (1997).

B.

Appellants' first argument is that the choice clauses, which make United States law inapplicable to disputes arising between them and Lloyd's, are unenforceable under the anti-waiver provisions of the United States securities laws. The Securities Act of 1933 provides: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." 15 U.S.C. § 77n. The Securities Exchange Act of 1934 contains a similar provision. *See* 15 U.S.C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."). According to the Securities and Exchange Commission ("SEC"), which filed an *amicus curiae* brief, "These provisions are essential to the enforcement of

[6]*See Haynsworth v. The Corporation, a/k/a Lloyd's of London,* 121 F.3d 956 (5th Cir.1997).

[7]*See Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227 (6th Cir.1995) (upholding choice clauses as basis for dismissing claims under Ohio securities laws).

[8]*See Bonny v. Society of Lloyd's,* 3 F.3d 156 (7th Cir.1993), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994).

[9]*See Richards v. Lloyd's of London,* 135 F.3d 1289, 1292 (9th Cir.1998).

[10]*See Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953 (10th Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992).

the securities laws in that they prevent persons from avoiding their obligations under those laws through the simple expedient of requiring investors to waive their rights under those laws as a condition to engaging in securities transactions."[11]

The district court rejected appellants' and the SEC's argument that the anti-waiver provisions categorically render unenforceable the choice clauses in the Lipcons' contract. Instead, the district court reviewed the clauses under the framework for evaluating choice provisions in international agreements first announced in *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). In *Bremen,* an admiralty case that did not involve the securities laws, the Court enforced a choice-of-forum clause that required litigation in the courts of London. Because "[w]e cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts," *id.* at 9, 92 S.Ct. at 1913, the Court concluded that forum-selection clauses in international agreements "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be "unreasonable' under the circumstances," *id.* at 10, 92 S.Ct. at 1913; *see id.* at 15, 92 S.Ct. at 1916 ("[I]n the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside."). Although the contract at issue in *Bremen* provided for a forum in which to litigate, as opposed to the substantive law that would apply to, any dispute, the Court noted that the choice-of-forum clause likely would have the effect of a choice-of-law clause:

> [I]t is the general rule in English courts that the parties are assumed, absent contrary indications, to have designated the forum with the view that it should apply its own law....

---

[11]SEC Br. *Amicus Curiae* (hereinafter "SEC Br.") at 2.

It is therefore reasonable to conclude that the forum choice clause was also an effort to obtain certainty as to the applicable substantive law.

*Id.* at 14 n. 15, 92 S.Ct. at 1915 n. 15.

In giving content to *Bremen* 's "strong showing" standard for invalidating international choice-of-forum clauses, courts have announced that those provisions will be found "unreasonable under the circumstances," *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotations omitted), and thus unenforceable only when: (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the provisions would contravene a strong public policy. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 594-95, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *Bremen,* 407 U.S. at 15-18, 92 S.Ct. at 1916-17; *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). Applying this test (hereinafter "the *Bremen* test"), the district court concluded that the choice clauses in this case are enforceable.

Appellants and the SEC contend that the *Bremen* test is inapplicable when Congress has spoken directly as to whether it is permissible to waive United States statutory remedies. They argue that to apply the *Bremen* test—which requires courts to assess public policy, *see Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or judicial decision.")—is tantamount to treating "the anti-waiver provisions [of the securities laws] as merely reflecting a Congressional direction to the courts to

11

decide whether "the public policies incorporated into' the securities laws would be undermined."[12]

This approach is incorrect, the SEC argues, because "[t]he anti-waiver provisions ... are not simply an expression of public policy that favors the United States securities laws unless other comparable laws are available. Rather, they are an express and unequivocal directive that the rights and obligations under the securities laws cannot be waived."[13] *See also Richards v. Lloyd's of London,* 135 F.3d 1289, 1297-98 (9th Cir.1998) (Thomas, J., dissenting).

Although appellants' argument finds strong support in the plain language of the anti-waiver provisions, which facially admit of no exceptions, precedent and policy considerations compel us to conclude that *Bremen* 's framework for evaluating choice clauses in international agreements governs this case. We turn first to an examination of Supreme Court precedent.

1.

In *Scherk v. Alberto-Culver Company,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), "the Supreme Court explicitly relied on *Bremen* in a case involving a securities transaction." *Richards v. Lloyd's of London,* 135 F.3d 1289, 1293 (9th Cir.1998). *Scherk* involved an international transaction to sell a company, where that transaction was based upon a contract that included arbitration and choice-of-law clauses that provided for the application of Illinois law by an arbitrator in France. When the deal soured, one of the parties challenged the enforceability of the arbitration provision. In enforcing the provisions, the Court relied in large part upon the nature of international agreements:

---

[12]SEC Br. at 14.

[13]SEC Br. at 14.

> [I]n the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, concerning the law applicable to the resolution of disputes arising out of the contract. Such uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction.

*Scherk,* 417 U.S. at 516, 94 S.Ct. at 2455; *see id.* at 516-17, 94 S.Ct. at 2456 ("A parochial refusal by the courts of one country to enforce an international arbitration agreement would ... invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.").

We recognize that *Scherk* differed from the case before us in that the choice clause before the Court in *Scherk* provided, by designating Illinois law as the governing law, for the application of United States securities law, *see id.* at 519 n. 13, 94 S.Ct. at 2457 n. 13 ("Under some circumstances, the designation of arbitration in a certain place might also be viewed as implicitly selecting the law of that place to apply to that transaction. In this case, however, "the laws of the State of Illinois' were explicitly made applicable to the arbitration agreement."), and thus that the Court in *Scherk* had no opportunity to decide if an international choice-of-law provision is enforceable if it conflicts with the anti-waiver provisions of the United States securities laws. Nevertheless, the Court's statement in *Scherk* that a choice-of-forum clause is "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction," 417 U.S. at 516, 94 S.Ct. at 2455, combined with the Court's observation that a forum-selection clause "might also be viewed as implicitly selecting the law of that place to apply to that transaction," *id.* at 519 n. 13, 94 S.Ct. at 2457 n. 13; *see also Bremen,* 407 U.S. at 13 n. 15, 92 S.Ct. at 1915 n. 15 (noting that in light of English law, it is "reasonable to

13

conclude that the forum clause was also an effort to obtain certainty as to the applicable substantive law"), indicates that international agreements—even those that render United States securities law inapplicable—are *sui generis.*[14]

Appellants nevertheless point our attention to a line of Supreme Court cases that they contend indicate the Court's disapproval of choice provisions that waive the substantive protections of United States law. Supreme Court precedent, however, does not resolve the precise issue presented in this case: namely, whether an *international* agreement may, through the interaction of choice-of-*forum* and choice-of-*law* clauses, prospectively waive the protections of the United States securities laws.

Appellants claim that the Court in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), indicated its unwillingness to permit choice provisions to eliminate United States statutory remedies. In *Mitsubishi,* the Court held that the Sherman Act did not render unenforceable a forum-selection provision in an international agreement, because "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the *substantive* rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* at 628, 105 S.Ct. at 3354 (emphasis added); *see id.* at 637, 105 S.Ct. at 3359 ("[S]o long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."). Appellants rely in particular on the Court's statement that "in the event the choice-of-forum and

---

[14]We think it clear that the agreement in this case is "truly international," *Scherk,* 417 U.S. at 515, 94 S.Ct. at 2455, as that term was used in *Scherk.* In this case, the parties to the agreement are from different countries, the negotiations leading up to the agreement took place in the United States whereas the closing took place in England, and the subject matter of the transaction concerned investment in an international insurance market.

choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue the statutory remedy for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19, 105 S.Ct. at 3359 n. 19. In *Mitsubishi,* however, the Court was not confronted with the scope of the anti-waiver provisions of the United States securities laws. *See id.* at 616, 105 S.Ct. at 3348 ("The principal question presented by these cases is the arbitrability, pursuant to the Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of claims arising under the Sherman Act and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction.") (internal citations omitted). More important, the Court in *Mitsubishi* recognized and affirmed *Scherk* 's policy of treating international commercial agreements as *sui generis. See Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355 ("As in *Scherk* ..., we conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in the domestic context.").

Appellants rely as well upon *Shearson/American Express, Inc., v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), in which the Court held that the anti-waiver provision of the Securities Exchange Act of 1934 did not render an arbitration agreement unenforceable, because "[b]y its terms, [section 78cc(a) ] only prohibits waiver of the *substantive* obligations imposed by the Exchange Act." *Id.* at 288, 107 S.Ct. at 2338 (emphasis added); *see also Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 485-86, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989) (holding that arbitration clause was not invalid under anti-waiver provisions of Securities

15

Act; stating that "[o]ur conclusion is reinforced by our assessment that resort to the arbitration process does not inherently undermine any of the *substantive* rights afforded to petitioners under the Securities Act") (emphasis added). *McMahon,* however, involved the enforceability of an arbitration clause in a *domestic* securities agreement. Although appellants contend that *McMahon* makes clear the Court's categorical unwillingness to permit waiver of the substantive remedies of the securities laws, we do not think that *McMahon* controls the case before us. As stated above, the Court consistently has treated "truly international agreements," *Scherk,* 417 U.S. at 515, 94 S.Ct. at 2455, differently than domestic transactions, which indisputably are subject to the anti-waiver provisions of the securities laws, *see McMahon,* 482 U.S. at 230, 107 S.Ct. at 2339.

Supreme Court precedent thus suggests that the enforceability of choice clauses in international agreements should be determined by a framework designed specifically for the international commercial context. Because the Supreme Court has not ruled on whether the anti-waiver provisions of the United States securities laws categorically render unenforceable choice-of-law clauses in international agreements, however, we turn to policy considerations.

2.

Underlying the Supreme Court's conclusions in *Bremen* and *Scherk* were two main concerns: (1) ensuring "the orderliness and predictability [that are] essential to any international business transaction," *Scherk,* 417 U.S. at 516, 94 S.Ct. at 2455; *see Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916 (stating importance of "present-day commercial realities and expanding international trade"), and (2) furthering international comity, *see Scherk,* 417 U.S. at 516, 94 S.Ct. at 2456 (condemning "parochial refusal[s] by the courts of one country to enforce ... international agreement[s]"); *Bremen,* 407 U.S. at 9, 92 S.Ct. at 1913 ("We cannot have trade and commerce in world markets and

16

international waters exclusively on our terms, governed by our laws, and resolved in our courts."). *See also Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355 (relying on "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes....").

To conclude that the anti-waiver provisions of the United States securities laws categorically preclude sophisticated parties from entering into international agreements—agreements that by definition involve parties and subject matter that would be subject to the laws of more than one nation if the parties did not contract *ex ante* for provisions governing choice of forum and choice of law—would undermine both policies upon which *Bremen* and *Scherk* were based. As the Ninth Circuit has observed, appellants' assertion that the statutory anti-waiver provisions categorically invalidate the choice clauses in the agreement with Lloyd's would, if correct, expand the reach of United States securities law to "any and all such transactions, no matter how remote from the United States." *Richards v. Lloyd's of London,* 135 F.3d 1289, 1293 (9th Cir.1998); *see also Allen v. Lloyd's of London,* 94 F.3d 923, 929 (4th Cir.1996) ("[W]e do not believe that Congress intended that the disclosure requirements of the United States securities law be exported and imposed as governing principles on markets conducted entirely in other countries simply because membership in such markets is solicited in the United States.").

We also find in the content of the *Bremen* test itself support for our conclusion that the anti-waiver provisions of the United States securities laws do not preclude application of the *Bremen* test to determine the validity of the choice clauses. A court will invalidate a choice clause in an international agreement when "enforcement would contravene a strong public policy of the forum in which the suit is brought...." *Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916; *see infra,* section III.C;

17

*Richards,* 135 F.3d at 1293; *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993). Thus, "[i]n *Bremen* itself, the Supreme Court contemplated that a forum selection clause may conflict with relevant statutes." *Richards,* 135 F.3d at 1293.

Although we do not deny that there is some force to appellants' argument that the anti-waiver provisions preclude application of the *Bremen* test, we believe that to invalidate the choice provisions for that reason in effect would be to conclude that "the reach of the United States securities laws [is] unbounded," *Richards,* 135 F.3d at 1293, and to ignore the Supreme Court's caveat that "[w]e cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts," *Bremen,* 407 U.S. at 9, 92 S.Ct. at 1913. Because we are unwilling so to conclude, we hold that the anti-waiver provisions of the United States securities laws do not categorically render unenforceable the Lloyd's choice clauses, and we join the seven other courts of appeals that have addressed the issue in holding that the *Bremen* test controls our resolution of the enforceability of the Lloyd's choice clauses. *See Richards,* 135 F.3d at 1292-94; *Haynsworth v. The Corporation, a/k/a Lloyd's of London,* 121 F.3d 956, 962 (5th Cir.1997); *Allen v. Lloyd's of London,* 94 F.3d 923, 928 (4th Cir.1996); *Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227, 1229-30 (6th Cir.1995); *Bonny v. Society of Lloyd's,* 3 F.3d 156, 159 (7th Cir.1993), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1362-63 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 957 (10th Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992).

III.

18

Appellants contend on appeal that even if the anti-waiver provisions of the United States securities laws do not *per se* invalidate the choice clauses, the district court erred in concluding that the *Bremen* test was satisfied and that the choice clauses in this case are enforceable. We disagree and conclude that the district court correctly applied the *Bremen* test.

As noted *supra,* section II.B, forum-selection and choice-of-law clauses "are presumptively valid where the underlying transaction is fundamentally international in character." *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1362 (2d Cir.) (citing *Bremen,* 407 U.S. at 15, 92 S Ct. at 1916), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). "This presumption of validity may be overcome, however, by a clear showing that the clauses are "unreasonable under the circumstances.'" *Roby,* 996 F.2d at 1363 (quoting *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotation omitted)). Choice clauses will be found "unreasonable under the circumstances," *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotations omitted), and thus unenforceable only when: (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of such provisions would contravene a strong public policy. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 594-95, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *Bremen,* 407 U.S. at 15-18, 92 S.Ct. at 1916-17; *Roby,* 996 F.2d at 1363. Appellants contend that the choice clauses in this case are unreasonable under the first, third, and fourth *Bremen* factors.

A.

Appellants first contend that the choice clauses were the product of fraud and overreaching. The only specific allegation in the complaint of fraud is that Lloyd's "tricked and fraudulently

19

induced [the Lipcons] to sign on or about Nov. 5, 1986 a forum selection clause" by making "fraudulent statements" that included the following:

> The purpose, in both instances, is to bring the agreements into line with ... the new Lloyd's legislation.

> \* \* \* \* \* \*

> The new Premiums Trust Deed will incorporate some new provisions which are mainly of a technical nature, and will not affect you greatly on a day to day basis.[15]

Appellants contend that allegation of these statements is sufficient to invalidate the choice clauses.

> In *Scherk,* the Court stated:

> In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud...." This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion.

417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14 (emphasis in original) (internal citations omitted). By requiring the plaintiff specifically to allege that the choice clause itself was included in the contract due to fraud in order to succeed in a claim that the choice clause is unenforceable, courts may ensure that more general claims of fraud will be litigated *in the chosen forum,* in accordance with the contractual expectations of the parties.

We conclude that the allegations in the Lipcons' complaint are insufficient to satisfy *Scherk* 's rigorous standard for pleading fraud. The first alleged statement by Lloyd's (or, presumably, by an agent of Lloyd's)—that "[t]he purpose, in both instances, is to bring the agreements into line with

---

[15]Second Am. Compl. at 3-4, ¶ 4.

... the new Lloyd's legislation"[16]—is in no way fraudulent or misleading. Indeed, the General Undertaking, which the Lipcons signed on the day that Lloyd's allegedly made this statement, specifically provides that "[t]hroughout the period of his membership of Lloyd's the Member shall comply with the provisions of Lloyd's acts 1871-1982[and] any subordinate legislation made or to be made thereunder...."[17] An allegation that the defendant made a statement that accurately brings to the attention of the plaintiff the substantive provisions of the contract is insufficient to support a claim that the choice clauses were included in the contract as a result of fraud.

The second allegedly fraudulent statement—that "[t]he new Premiums Trust Deed will incorporate some new provisions which are mainly of a technical nature, and will not affect you greatly on a day to day basis"—likewise fails to satisfy *Scherk*'s standard. Appellants contend that the insertion of the choice clauses in the General Undertaking was a change of more than simply "a technical nature" and that the statement thus was misleading and fraudulent. According to the original agreement, which was signed in October 1984 by Mitchell Lipcon and Lloyd's, the Premiums Trust Deed governs the disposition of "[a]ll premiums and other moneys collected on behalf of the Name" and provides that all such funds "shall be held upon the trusts declared in the Trust Deed."[18] An allegation that the Lipcons were induced—even fraudulently induced—to make changes in the Premiums Trust Deed is insufficient to support a claim that the choice clauses, which are contained in a *separate* agreement (the General Undertaking), were induced by fraud. As stated

---

[16]It is not clear what the phrase "in both instances" refers to, but we assume *arguendo* that the phrase refers at least in part to the General Undertaking, as well as to the choice clauses specifically.

[17]R:1-8, Ex. B.

[18]R:1-8, Ex. C.

21

above, this court will invalidate a choice clause only if "the *inclusion of that clause in the contract was the product of fraud or coercion.*" *Scherk,* 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14 (emphasis in original). Appellants have not satisfied this standard.

B.

Appellants also contend that the remedies provided by English law are inadequate. They argue that no cause of action exists under the laws of England analogous to an action under Section 12(1) of the Securities Act of 1933 for securities registration violations. *See Bonny v. Society of Lloyd's,* 3 F.3d 156, 162 (7th Cir.1993), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994). Appellants also contend that their remedies under English law for misrepresentations made in connection with the sale of a security are inferior to those available under Section 12(2) of the Securities Act of 1933 because Section 14 of the Lloyd's Act of 1982 immunizes Lloyd's from any claims under the English Misrepresentations Act, absent a showing of bad faith. Finally, appellants assert that Lloyd's is immune from liability under England's Financial Services Act of 1986, which provides private remedies for fraud in connection with securities transactions, and that unlike United States securities law, *see* 15 U.S.C. § 77o, English law does not recognize controlling person liability.

We have little doubt that "the United States securities laws would provide [appellants] with a greater variety of defendants and a greater chance of success due to lighter scienter and causation requirements...." *Roby,* 996 F.2d at 1366. We will not invalidate choice clauses, however, simply because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States. Instead, we will declare unenforceable choice clauses only when the remedies available in the chosen forum are so inadequate that enforcement would be

22

fundamentally unfair. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *Roby,* 996 F.2d at 1360-61 ("In the absence of other considerations, the agreement to submit to arbitration or the jurisdiction of the English courts must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum."); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 958 (10th Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992) ("The fact that an international transaction may be subject to laws and remedies different and less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair.").

Like the seven other courts of appeals that have addressed this issue, we hold that English law provides remedies adequate to address the complaints of the aggrieved Names. Although Section 14 of the Lloyd's Act of 1982 exempts Lloyd's, its officers, and its employees from liability under the English Misrepresentations Act, no other entity within Lloyd's—such as the Members' Agents and Managing Agents, both of whom owe a fiduciary duty to the Names—is exempt. *See Roby,* 996 F.2d at 1365; *Richards,* 135 F.3d at 1296 ("The Names have recourse against both the Member and Managing Agents for fraud, breach of fiduciary duty, or negligent misrepresentation.") (citing *Arubuthnott v. Fagan and Feltrim Underwriting Agencies, Ltd.,* 3 Re LR 145 (H.L.1994)); *Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227 (6th Cir.1995) (noting that "England's highest appellate court recently upheld a lower court's ruling that Members' Agents can be contractually liable for negligent underwriting by the Managing Agents who run the insurance syndicates at Lloyd's") (citing *Deeny v. Gooda Walker Ltd.,* slip op. (Q.B. Div'l Ct. Apr. 12, 1994), *appeal dismissed,* slip op. (H.L. July 25, 1994)). In addition, even Lloyd's itself is not immune from liability if appellants

23

can make a credible showing of bad faith. We therefore conclude that the contractually chosen law is not fundamentally unfair and thus does not provide a basis upon which to deny enforcement of the choice clauses.

C.

Appellants argue that enforcement of the choice clauses would contravene a strong public policy, namely the policy expressed in the anti-waiver provisions of the United States securities laws that substantive remedies be available for securities violations. We already have rejected appellants' argument that the anti-waiver provisions categorically render invalid the choice clauses. *See supra,* section II.B. We now must decide whether enforcement of the choice clauses, which would require appellants to litigate in England under English remedies, would undermine the public policies more generally expressed in the United States securities laws. In so doing, we are mindful that at least one commentator has criticized the decisions of some other courts of appeals on the ground that the public policy inquiry "necessitates an exploration of foreign legal regimes about which U.S. courts are likely to know little or nothing" and requires courts to "determine which of two incommensurables is greater." *See* D. Hall, Note, *No Way Out: An Argument Against Permitting Parties to Opt Out of U.S. Securities Laws in International Transactions,* 97 Colum. L.Rev. 57, 83 (1997). Nevertheless, we cannot avoid our duty to ensure, by determining whether enforcement of the choice clauses would contravene public policy, that enforcement of the choice clauses is not "unreasonable under the circumstances." *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotation omitted).

Although we share the concern of the Second and Seventh Circuits that "the contract clauses may operate "in tandem' as a prospective waiver of the statutory remedies for securities violations,"

24

*Roby,* 996 F.2d at 1364 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 3359 n. 19, 87 L.Ed.2d 444 (1985)); *accord Bonny,* 3 F.3d at 160-61, we agree with those courts and the other five circuits that have addressed the issue that enforcement of the Lloyd's choice clauses does not contravene public policy. We reach this conclusion in part for the reasons stated by the other courts of appeals and in part for the reasons stated in section III.B—that English remedies are adequate to provide redress for the alleged actions that gave rise to appellants' United States securities claims.

In *Roby* and *Bonny,* the Second and Seventh Circuits, respectively, concluded that "[t]he framers of the securities laws were concerned principally with reversing the common law rule favoring "caveat emptor,' " *Roby,* 996 F.2d at 1364 (citing *SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1025 n. 51 (D.C.Cir.1978)), and accordingly that the United States Securities laws embody the policies of "insuring full and fair disclosure by issuers and deterring the exploitation of United States investors," *Bonny,* 3 F.3d at 161. Appellants and the SEC do not disagree that the securities laws were intended to ensure disclosure and deter exploitation, but they argue that the Second and Seventh Circuits, as well as the district court in this case, ignored the compensatory function of private actions under the securities laws.

We agree with the SEC that private actions under the securities laws "serve as an important means of providing recompense to investors who have been harmed by wrongdoers."[19] We are more confident than the SEC, however, that the compensatory policy underlying United States securities law will be vindicated by litigation in English courts under English law; this is especially so given our conclusion that English law provides adequate remedies to appellants in this case. *See supra,*

---

[19]SEC Br. at 24.

section III.B. Because we conclude that "the available remedies and potential damage recoveries suffice to deter deception of American investors[,] to induce the disclosure of material information to investors," *Bonny,* 3 F.3d at 162, and to provide redress to aggrieved Names, we hold that the choice clauses satisfy the public-policy prong of the *Bremen* test. We thus conclude that the district court did not err in finding that the choice clauses are enforceable.[20]

## IV.

Finally, appellants argue that the district court erred in concluding that Charles and Barbara Lipcon, who signed letters of credit to provide collateral for their spouses but did not sign the General Undertaking, are so closely related to the dispute that they are bound by the choice clauses. We hold that the district court did not err and that the spouses must litigate their claims in English courts under English law, in accordance with the choice clauses.

"In order to bind a non-party to a forum selection clause, the party must be "closely related' to the dispute such that it becomes "foreseeable' that it will be bound." *Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 209 (7th Cir.1993) (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988)); *see also Manetti-Farrow,* 858 F.2d at 514 n. 5 ("[A] range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses."). In *Hugel,* which involved a suit brought by a Name against Lloyd's, the Seventh Circuit affirmed the district court's finding that two non-signatory corporations were bound by the Name's assent to the Lloyd's choice clauses. *See* 999 F.2d at 209-10. The district court based its

---

[20]Our conclusion is not affected by appellants' pleading of a cause of action under RICO. *See Richards,* 135 F.3d at 1296 ("The addition of RICO claims does not alter our conclusion."); *Roby,* 996 F.2d at 1366 ("Although the remedies [in England] and disincentives [to deter English issuers from exploiting American investors] might be magnified by application of RICO, we cannot say that application of English law would subvert the policies underlying that statute.").

finding upon the fact that the Name owned 99% of one corporation, which owned 100% of the other. *See id.* The court of appeals noted that "[w]hile it may be true that third-party beneficiaries to a contract would, by definition, satisfy the "closely related' and "foreseeability' requirements, a third-party beneficiary status is not required." *Id.* at 209-10 n. 7.; *cf. Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1297 (3d Cir.1996) (holding that a sister corporation that did not sign an arbitration agreement could not be bound by the agreement, but noting that if the "corporation's interests were directly related to, if not predicated upon, the [signatory's] conduct," the corporation would have been subject to agreement).

Because, as the district court found, the interests of the spouses in this dispute are completely derivative of those of the Name plaintiffs—and thus "directly related to, if not predicated upon" the interests of the Name plaintiffs, *see Dayhoff,* 86 F.3d at 1297—we affirm the district court's conclusion that the spouses are bound by the choice clauses.

V.

Our conclusion that the Lipcons are bound by the choice clauses does not in any way reflect our view of the merits of their substantive claims. We hold simply that the Lipcons must "honor [their] bargains," *Mitsubishi,* 473 U.S. at 640, 105 S.Ct. at 3361 (quoting *Alberto-Culver Co. v. Scherk,* 484 F.2d 611, 620 (7th Cir.1973) (Stevens, J., dissenting), *rev'd,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)), and attempt to vindicate their claims in the English courts under English law.

The judgment of the district court is AFFIRMED.